DAVID GILTINAN, DEFENDANT IN ERROR, v. FRANCES W. LEHMAN ET AL., PLAINTIFFS IN ERROR.

Submitted December 11, 1900—Decided March 4, 1901.

Where an agent was employed to negotiate a mortgage loan for his principals upon their property, by a writing which also authorized him to bind them to pay for making "complete searches" of the

title to premises proposed to be mortgaged, it was *held*, that an agreement by him, assuming to act as their attorney, with the loaning company, that he would arrange for giving it "clear title insurance with the mortgage security," was *ultra vires* of such written authority.

On error to the Supreme Court.

For the plaintiffs in error, *George A. Bourgeois.*

For the defendant in error, *Norman Grey.*

The opinion of the court was delivered by

VREEDENBURGH, J. This is a suit by a brokerage agent against the owners of a hotel property at Atlantic City, N. J., to collect commissions for his services in negotiating for them a mortgage loan of $25,500 from the Girard Life Insurance Annuity and Trust Company. The declaration avers, and the evidence shows that after the plaintiff below had negotiated the loan, the defendants refused to accept it, notwithstanding the fact that the plaintiff had procured the loaning company to make it. At the conclusion of the evidence the learned trial justice placed a construction upon the writings between the parties by holding that, upon their face, they entitled the plaintiff to recover the commissions named in them, and directed the jury to find a verdict for plaintiff against defendants' objection and exception. The written application for the loan, signed by the defendants below, dated February 8th, 1899—made originally for a loan of $30,000—contains (*inter alia*) the following clause, viz.: "For making said loan I agree to pay you two per cent. commission thereon; also, to pay for writing and recording all papers connected therewith; to pay for making complete searches and to pay all other necessary expenses." A few days after the date of the application, but certainly before February 27th, 1899, by an undated letter—the precise time of the delivery of which is left by the evidence in some doubt—the defendants caused a letter to be sent to the plaintiff in which occurs the follow-

ing, viz.: "If you cannot succeed in getting $26,000 you may
take $25,500, and if the trust company will take the mortgage
for this amount ($25,500) you may accept the offer at once,
mortgage to be given for five or seven years (5 or 7) at six
per cent. You may accept nothing less than $25,500, as
before stated, or $28,000 in two mortgages; second m. to be
a stated amount." In this situation of so much of the
writings between the parties as are material to be now quoted
and considered, the plaintiff, on February 27th, 1899, assum-
ing to act under the application as the attorney in fact of
the defendants, in their absence agreed, in writing, with the
Girard Company as follows, viz.: "2-27, '99. The Girard
Trust Company having agreed to lend on the within named
property $25,500 for five years, at six per cent. per annum,
I agree to arrange for the giving said company .clear *title
insurance* with the mortgage securing said loan, and that
fire insurance.in the amount of, at least, $20,000 be main-
tained upon the property." The crucial question to be now .
determined is whether this undertaking of the agent to give
the loaning company "title insurance" was within the warrant
of his written authority from his principals, for if not, they
rightfully declined to accept the loan and to pay the commis-
sions sued for, under the plainest principles of the law relat-
ing to such agencies. The right of the plaintiff to his com-
missions was not complete until he had negotiated the loan
on the terms in which he was authorized. *Hinds* v. *Henry,
7 Vroom* 328; *Runyon* v. *Wilkinson et al., 28 Id.* 420, and
cases cited in 7 *Id.* 332.

The giving of title insurance was certainly not within the
express terms of the agency. Was it within its implied scope?
Are complete searches substantially equivalent to "title in-
surance" so that the furnishing of the latter could not have
involved the defendants in any other or greater expenses, or
risks of failure to accomplish their contemplated purpose,
than in procuring the former? This assumption by the agent
must, it seems to me, be deemed to have been an excess of
his authority. A brief consideration of the precise meaning

of the term "title insurance," as distinguished from "complete searches" of title, as it has grown to be applied and adapted to the security of titles will, I think, satisfy any one that they are not in their essence equivalent terms. That "title insurance" has a much broader scope will be evident from a simple definition of its effects. The business of title insurance properly belongs to, and in fact, has fallen into the care and control of financial corporations of large capital and established responsibility that have, practically, perpetual chartered life, empowering them to issue policies of insurance of titles, operative without limit as to time, *i. e.,* enforceable at any future period as fixed by certain conditions expressed in the policies.

In consideration of the payment of cash premiums, the amount of which is fixed by special agreement, guided by rates proportional to the amount insured, these companies issue such policies to owners of lands, or to their mortgagees, agreeing to insure the party interested and his transferees, his heirs, devisees and personal representatives, against all loss or damage, not exceeding the sum named in the policies, which the insured shall sustain, not only by reason of any defects of title, or from encumbrances affecting the designated property, but also against all loss or damage by reason of the *unmarketability* of the title of the insured in the premises. By force of such policies the liability of the insuring companies extends, not merely in favor of the contracting party and his heirs, &c., but also in favor of any third person to whom he may have transferred the policy; it also extends to defects of title, and to the existence of any encumbrance, whether discoverable or not, by the most thorough and complete searches, provided only that any judgment adverse to the title shall be pronounced, under the conditions named, by any competent court.

The investigations of title to and encumbrance of lands by these companies must, therefore, in order to protect them against possible losses, reach to facts beyond the range of searches however complete, such as the existence of easements

which do not depend upon express grants; the numerous conditions and circumstances constituting title, or encumbrance, arising from the adverse possession of parties not of record, and to many other like matters easily conceivable which complete searches might not disclose, but which might be sufficient to cast a cloud upon the titles and affect, more or less seriously, their market values—a cloud sufficient, perhaps, to deter a *bona fide* purchaser from buying and cause him to reject the title because of it. Thus it will be perceived that owners of lands, who have become bound by their agents to procure title insurance at the demand of loaning parties, might be obliged to incur an expense not confined to, or at all regulated by, the proper fees and cost of complete searches—an expense enhanced by the additional value of the protection from the consequences of undiscovered defects which the broad terms of the policies and the larger resources and longer life of the insuring companies would afford beyond any indemnification possible to be secured by the responsibility of certified searches. Owners agreeing to furnish such insurance must, *ex necessitate,* lay bare their titles to the disclosure of every shadow which, though not amounting to defects, may impair the reputation, and consequently the vendibility of their titles. Indeed, the very success of their applications for loans from any sources might thence depend and they thus be subjected to risks of failure they could not have originally contemplated. But not to prolong this opinion unduly, I think it is already sufficiently apparent that the making of complete searches of title of landed property and the furnishing of title insurance therefor, are distinctly different essences, and that in the case at bar the obligation to procure the latter should not be implied from an agreement to pay for the former. If the above reasoning be correct, it is manifest also that title insurance cannot be declared, as a matter of law, to have been a "necessary expense" within the intent of the application for the loan, and the result is that the judgment below should be reversed.

*For affirmance*—None.

*For reversal*—THE CHANCELLOR, CHIEF JUSTICE, VAN SYCKEL, DIXON, GARRISON, GUMMERE, COLLINS, FORT, GARRETSON, BOGERT, KRUEGER, HENDRICKSON, ADAMS, VREDENBURGH, VOORHEES. 15.